## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

RICHARD L. MCCOY,

      Petitioner,

v.                                  Case No. 3:20-cv-521-TJC-PDB

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## **ORDER**

### I.   **Status**

Petitioner, an inmate of the Florida penal system, is proceeding on a pro

se Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 (Doc. 1) supported

by a Memorandum of Law (Doc. 2). He challenges a 2017 state court (Duval

County, Florida) judgment of conviction for first degree murder and armed

robbery. He is serving a term of life imprisonment.[1] Respondents filed a

---

[1] In 2001, Petitioner was sentenced to death for the murder conviction and life for the robbery conviction. Ex. 22. On November 9, 2017, he was resentenced to life on the murder conviction based on Hurst v. Florida, 577 U.S. 92 (2016), and Hurst v. State, 202 So. 3d 40 (Fla. 2016). Exs. 47 (sentencing transcript), 48 (judgment). Petitioner appealed, and on February 25, 2019, the First District Court of Appeal per curiam affirmed Petitioner's new judgment and sentence without issuing a written opinion. Rashid v. State, 264 So. 3d 138 (Fla. 1st DCA 2019). Petitioner's state court docket reflects that on September 20, 2019 (mailbox rule), Petitioner filed a pro se postconviction motion pursuant to Florida Rule of Criminal Procedure 3.850, which the state court denied as untimely on September 30, 2019. See McCoy v. State, 16-

Response (Doc. 20) with exhibits (Docs. 37-1 to 37-56; Ex.). Petitioner filed a Reply (Doc. 32). This case is ripe for review.[2]

## II. __Governing Legal Principles__

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems,

---

2000-cf-8117 (Fla. 4th Cir. Ct.). Petitioner appealed, and on August 28, 2020, the First DCA per curiam affirmed the denial of his postconviction motion without issuing a written opinion. McCoy v. State, 301 So. 3d 202 (Fla. 1st DCA 2020). Petitioner appealed to the Florida Supreme Court, which dismissed the appeal for lack of jurisdiction. McCoy v. State, No. SC20-1485, 2020 WL 6051195, at *1 (Fla. Oct. 14, 2020).

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The Court finds that "further factual development" is unnecessary. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1),

(2). A state court's factual findings are "presumed to be correct" unless rebutted

"by clear and convincing evidence." <u>Id.</u> § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." <u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." <u>Richter</u>, 562 U.S. at 101 (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> [at 102] (citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. <u>See, e.g.</u>, <u>Mitchell v. Esparza</u>, 540 U.S. 12, 18 (2003); <u>Lockyer</u>, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

<u>Bishop v. Warden, GDCP</u>, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal

citations modified).

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254

habeas action in federal court, a petitioner must exhaust all state court

remedies that are available for challenging his state conviction. <u>See</u> 28 U.S.C.

4

§ 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365-66; O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004) (internal citations modified).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas

review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman, 501 U.S. at 747-48; Wainwright v. Sykes, 433 U.S. 72, 84-85 (1977). A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 131 S. Ct. 1120, 1127-28 (2011); Beard v. Kindler, 130 S. Ct. 612, 617-18 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S. at 750.

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012) (internal citations modified). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of

justice. <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010). For a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." <u>McCoy v. Newsome</u>, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." <u>Id.</u> at 1261 (quoting <u>Carrier</u>, 477 U.S. at 494).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999) (internal citations modified).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." <u>Carrier</u>, 477 U.S. at 496. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

7

Ward, 592 F.3d at 1157 (internal citations modified). "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

## C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); Strickland v. Washington, 466 U.S. 668, 687 (1984)). Courts employ a two-part test when reviewing ineffective assistance of counsel claims. See Strickland, 466 U.S. at 687.

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was

8

within the "wide range" of reasonable professional assistance. Id. at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

Richter, 562 U.S. at 104 (internal citations modified).[3]

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward, 592 F.3d at 1163. Both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation; thus, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay

---

[3] This two-part Strickland standard also governs a claim of ineffective assistance of appellate counsel. Overstreet v. Warden, 811 F.3d 1283, 1287 (11th Cir. 2016). "Appellate counsel has no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit meritorious) arguments. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Id. (internal quotations and citations omitted). To satisfy the prejudice prong, a petitioner must show a reasonable probability that "but for the deficient performance, the outcome of the appeal would have been different." Black v. United States, 373 F.3d 1140, 1142 (11th Cir. 2004); see also Philmore v. McNeil, 575 F.3d 1251, 1264-65 (11th Cir. 2009) (prejudice results only if "the neglected claim would have a reasonable probability of success on appeal").

9

<u>v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." <u>Strickland</u>, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is afforded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." <u>Richter</u>, 562 U.S. at 105. But "[e]stablishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." <u>Id.</u> (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 105.

<u>Hittson v. GDCP Warden</u>, 759 F.3d 1210, 1248 (11th Cir. 2014) (internal citations modified). In other words, "[i]n addition to the deference to counsel's performance mandated by <u>Strickland</u>, the AEDPA adds another layer of deference--this one to a state court's decision--when we are considering whether to grant federal habeas relief from a state court's decision." <u>Rutherford v.</u>

<u>Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010).

## III.  <u>Analysis</u>

### a. **Ground One**

Petitioner argues that his trial counsel was ineffective in multiple ways during the guilt phase of his trial. The Court addresses each claim in turn.

#### i.   <u>Failing to Rebut Zsa Zsa Marcel's Testimony</u>

Petitioner argues that his trial counsel was ineffective for failing to present evidence that would refute Zsa Zsa Marcel's testimony that Petitioner confessed to her. Doc. 1 at 33. He argues that Marcel's deposition testimony and pretrial sworn statement conflicted as to the time in which Petitioner allegedly confessed to her, and counsel should have called witnesses to testify that Petitioner was at a birthday party for his sister at the time Marcel said Petitioner allegedly confessed to her. Id.[4]

---

[4] The Court did not locate the full deposition transcript of Marcel or her pretrial sworn statement in the exhibits submitted by Respondents in this case. However, the full transcript of Marcel's deposition and her sworn statement were filed in paper form only in Petitioner's prior habeas case relating to these convictions which he filed when he was originally sentenced to death. <u>See</u> <u>McCoy v. Secretary</u>, No. 3:13-cv-706-TJC-PDB (M.D. Fla); <u>see also</u> Doc. 36 (explaining the difficulty Respondents encountered in filing the exhibits in this case). The Court takes judicial notice of the transcript and statement, and for ease of reference, attaches both to this Order.

Petitioner raised this claim in his postconviction motion filed in state court pursuant to Florida Rule of Criminal Procedure 3.851. The state court held an evidentiary hearing, after which it denied Petitioner's claim. Ex. 42 at 7-8, 10-11.

Petitioner appealed, and the Florida Supreme Court per curiam affirmed the state court's decision in a written opinion. As to this issue, the court found as follows:

> In his first claim on appeal, McCoy contends that trial counsel was ineffective for the failure to present the testimony of three witnesses.
>
> *Birthday Party Witnesses*—McCoy asserts that, if presented during trial, his mother and Diana Peterson, a family friend, would have testified that McCoy was at a birthday party for his sister during the time when Marcel claimed McCoy confessed to her that he participated in the robbery/murder. According to McCoy, this would have damaged Marcel's credibility and caused the jury to doubt the veracity of her testimony.
>
> It should be noted that both the postconviction court's order and the State's brief addressing this subclaim rely upon incorrect facts. The postconviction court's order provides, in part:
>
> > Defendant claims that counsel should have presented the testimony of . . . Josie McCoy, to show that the Defendant was with her *on the evening of the murde*r. The Defendant claims that this testimony would have undermined Zsa Zsa Marcel's statement that the Defendant was with her *on the evening of*

12

*the murder*, and would have contradicted Ms. Marcel's testimony that the Defendant confessed to her on that evening. At the time of this conversation, Ms. Marcel and the Defendant were under surveillance by the Jacksonville Sheriff's Office, and this confession was tape recorded.

(Emphasis supplied.) First, this Court's decision on direct appeal reflects that according to Marcel, McCoy confessed to her *the day after the murder*, June 14, 2000, the same day that McCoy allegedly attended a birthday party for his sister. See McCoy[ v. State], 853 So. 2d [396,] 399 [(Fla. 2003)]. Second, our decision reflects that Marcel had *two* conversations with McCoy during which the pair discussed the murder at the ABC Liquors store. The first occurred on the day after the murder, June 14, 2000, and the second, during which Marcel was in possession of a hidden recording device, occurred on June 20, 2000. Id.

Further, in his postconviction motion, McCoy asserted that the testimony of his mother would have impeached Marcel's assertion that McCoy confessed to her *on June 14, 2000*. In the motion, he stated that Marcel "made a vague claim about [McCoy] being with her in the evening of *the day after the murder*," and that his mother could have impeached Marcel with testimony that McCoy was actually at a birthday party from 5 p.m. until 7 p.m. (Emphasis supplied.) Therefore, this claim was *not* directed to the conversation that occurred on June 20, which was recorded and occurred under police surveillance. Accordingly, the State's assertion that McCoy's first claim was without merit because the occurrence of this conversation could have been proven by undercover officers is incorrect. Similarly, to the extent the postconviction court's denial of this subclaim is based upon the fact that the June 20 conversation was recorded by police, the order is also incorrect.

13

Nonetheless, for the reasons discussed below, this subclaim was properly denied.

During the evidentiary hearing, Diana Peterson testified that on June 14, 2000, she was with McCoy and his mother at a birthday party for McCoy's sister between 5 p.m. and 7 p.m. However, Peterson also exhibited confusion with regard to dates. When asked during cross-examination what year the birthday party occurred, Peterson replied that she thought it occurred during 2005 or 2006. Peterson also testified that she did not know where McCoy had been before the party or where he went once he left.

Trial counsel admitted that he did not have all of his notes from McCoy's trial. However, he acknowledged that he spoke with the mother, and she told him that McCoy was with her and other family members on June 14 at a birthday party. Trial counsel explained during cross-examination that he did not present the mother as a witness because he did not believe that her testimony would have assisted McCoy's defense. Confusion about which conversation the mother's testimony would have impeached—the June 14 conversation or the June 20 conversation—permeated cross-examination of trial counsel:

> STATE: Were you aware that at the time Ms. Marcel was alleged to have had this conversation with your client that was recorded that the two of them were being surveilled by Jacksonville Sheriff's Office personnel?

> TRIAL COUNSEL: Yes, I knew.

> STATE: So that those people could have identified his voice from the tape as seeing him with Ms. Marcel?

TRIAL COUNSEL: That's possible, yeah.

STATE: And at anytime did you have doubts about whether or not it was Mr. McCoy's voice on the tape that you were furnished?

TRIAL COUNSEL: No.

Despite this confusion, McCoy's claim of ineffectiveness fails because he cannot demonstrate that he was prejudiced by trial counsel's failure to present his mother or Diana Peterson as witnesses. See generally Ferrell[ v. State], 29 So. 3d [959,] 969 [(Fla. 2010)] (holding that a court is not required to issue a specific ruling on the performance component of Strickland when it is evident that the prejudice component is not satisfied). The record reflects that their testimonies would not have actually discredited that of Marcel.

The direct appeal record evidences that Marcel fluctuated as to when she saw McCoy on June 14, 2000. In Marcel's sworn statement, the following discussion occurred:

STATE ATTORNEY: Do you remember about what time of day it was?

MARCEL: It was, like, *evening*.

STATE ATTORNEY: Was it daylight or was it still—

MARCEL: It was light. It was, like, *afternoon*.

(Emphasis supplied.) During her deposition, Marcel indicated that she and McCoy met during the *evening*

15

of June 14, but also noted that she could not designate an exact time:

> TRIAL COUNSEL: And what time of the day was it that you were with him?
>
> MARCEL: *Evening*.
>
> TRIAL COUNSEL: After 6?
>
> MARCEL: Maybe.
>
> . . . .
>
> TRIAL COUNSEL: And how long do you think you were with him on that day, the day he told you he had hit the ABC?
>
> MARCEL: Maybe three or four hours.
>
> . . . .
>
> TRIAL COUNSEL: Do you have any idea what time it was when you were eating, was it the normal dinner hour?
>
> MARCEL: Well it's like a buffet place so it wasn't—we didn't go there actually for dinner. It was just to eat off a buffet. *So I don't know exactly a time*.
>
> TRIAL COUNSEL: Was it dark?
>
> MARCEL: No, almost but not dark, no. No, it wasn't dark.

(Emphasis supplied.) Finally, during trial, Marcel testified that she saw McCoy on the *afternoon* of June 14, 2000, and they spent three or four hours together.

In none of these prior proceedings did Marcel state that McCoy confessed to her specifically between the hours of 5 p.m. and 7 p.m.—the time of the birthday party. In fact, during her deposition Marcel stated that she could not specify a precise time when she and McCoy were together. Given the vagueness of her statements, and the three-to-four hour timeframe that Marcel asserts she and McCoy were together, the pair could have met on June 14, 2000 at 1 p.m., i.e., *before* the birthday party, *or* at 7:30 p.m., i.e., *after* the birthday party. In support of the latter, the conversation occurred during the summer, and therefore, it would have still been daylight well after 7:30 p.m.

Thus, the mother's and Diana Peterson's testimonies with regard to McCoy's appearance at the birthday party do not actually contradict, nor are they diametrically inconsistent with, Marcel's sworn statement, her deposition, or her trial testimony as to the time on June 14 that McCoy confessed to her. Indeed, the events of the day can be reconciled such that McCoy both attended his sister's birthday party *and* met with Marcel for three to four hours on June 14, 2000. Given this lack of definitive conflict, McCoy cannot satisfy the prejudice prong of <u>Strickland</u> because he has failed to demonstrate "a reasonable probability that 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" <u>Bradley[ v. State]</u>, 33 So. 3d [664,] 672 [(Fla. 2010)] (quoting <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct. 2052). Our confidence in the outcome of McCoy's trial has not been undermined.

Moreover, even if these witnesses had testified, this would not change the fact that Marcel was able to recount specific facts about the robbery *that were not*

*public knowledge.* Arguably the most compelling fact relayed by Marcel was the following:

> [T]hey went to the safe and that they had [the victim] open the safe. [McCoy] said after they opened the safe he told the guy to take the lady in another part of the store. He said as he was getting the money he heard seven gunshots. [McCoy] said he went—when he heard the gunshots he went straight to the VCR to see if they were being recorded. *He said the VCR was on pause like it had been paused the night before, and he said that he didn't think they were being recorded so he left the store.*

(Emphasis supplied.) Detective Gilbreath testified that when he entered the store office after the murder he observed a VCR, and the counter display on that VCR was not moving. When asked if it had been released to the media that "one of the surveillance cameras in the store had been put on pause" at the time that Gilbreath spoke with Marcel on June 20, he answered in the negative. Thus, Marcel had knowledge of a very specific detail about the crime before that detail was released to the public. Despite discrepancies between McCoy's "bragging" description of the robbery/murder and the actual facts of the crime, Marcel's testimony with regard to this particular detail of the crime scene as it was observed by law enforcement confirms that McCoy was the person who robbed the liquor store and murdered the victim.

In further support of our conclusion that McCoy has failed to demonstrate prejudice is the fact that powerful evidence—independent of Marcel's testimony of her conversation with McCoy on June 14—was introduced during trial to establish that McCoy was the perpetrator of the robbery and murder, including the following: (1) a surveillance camera from the ABC

18

Liquors store revealed that an African–American male committed the robbery and murder; (2) during the June 20, 2000 recorded conversation between Marcel and McCoy, he related details of his involvement in the crime; (3) during trial, McCoy admitted that it was his voice on the recording; and (4) although ABC Liquors store pouches were "kept within the store office at all times, and only store managers were involved with the pouches," three of McCoy's fingerprints were discovered on a pouch recovered from the crime scene. McCoy, 853 So. 2d at 399.

In light of the foregoing, McCoy has failed to satisfy Strickland, and he is not entitled to relief under this subclaim.

McCoy v. State, 113 So. 3d 701, 708-11 (Fla. 2013).

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, this Court concludes that the state court's adjudication was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Therefore, Ground One(i) is due to be denied.

ii.   Failure to Call Victor Williams

Petitioner argues that his trial counsel was ineffective for failing to call Victor Williams as a witness. Doc. 1 at 35-38. He claims that Williams would have testified that he did not see anyone "around the business or near the side door just moments before the crime was alleged to have occurred," which would

have rebutted "the State's assertion that a back door was used by the perpetrator." Id. at 37.

Petitioner raised this claim in his Rule 3.851 motion. The state court held an evidentiary hearing, after which it denied Petitioner's claim. Ex. 42 at 6-7.

Petitioner appealed, and the Florida Supreme Court per curiam affirmed the state court's decision in a written opinion. As to this issue, the court found as follows:

> *ABC Liquors Witness*—McCoy next claims that, if presented as a witness, Victor Lynn Williams would have testified that at 8:14 a.m. on the morning of the murder, he was placing garbage in the ABC Liquors store dumpster, and he saw the victim alone in the store parking lot. According to McCoy, this testimony would have contradicted Marcel's testimony that McCoy and a second perpetrator "rushed" the victim as she opened the back door.

> Victor Lynn Williams did not testify during the evidentiary hearing. However, trial counsel provided the following qualified explanation as to why he did not present Williams as a witness:

>> I don't have all of my notes where I could figure out whether I even wrote it down. But as I understand it and as I remember it, that dumpster was not in view of the back door where the victim in this case usually entered the business, and he would not have been able to see her at the back door, and I think that the point was whether she—whether anybody else, whether it was one person or two people, or whether he could have

20

seen the person who rushed her at the door.

McCoy has failed to establish under either prong of <u>Strickland</u> that trial counsel was ineffective under this subclaim. First, counsel offered a reasonable explanation with regard to why he did not present Williams as a witness—his testimony would not have refuted that of Marcel because Williams could not see the back of the store from the dumpster. This was a reasonable strategic decision and does not evidence any deficiency on the part of trial counsel. <u>See</u> <u>Occhicone[v. State]</u>, 768 So. 2d [1037,] 1048 [(Fla. 2000)] (noting that "strategic decisions do not constitute ineffective assistance of counsel").

Although Williams did not testify during the evidentiary hearing, a copy of his deposition was attached to a pro se motion for postconviction relief submitted by McCoy, and this deposition supports trial counsel's explanation. In his deposition, Williams stated that the dumpster in which he disposed of his garbage was in front of the ABC Liquors store, but during trial, various witnesses testified that the victim entered the store through a door located at the back of the building. Further, although Williams spoke with the victim on the morning of the murder, he departed as she was walking through the parking lot and did not see which door she used to enter the building:

> TRIAL COUNSEL: Okay. When you pulled off that morning after you talked with her, were you able to see where she went?
>
> WILLIAMS: She had just got her stuff out of the trunk and she was closing the trunk. And she went around the passenger side and was walking towards the [store].

TRIAL COUNSEL: Did you see what door she went in or did you see her approach a door?

WILLIAMS: No. Because her car is parked far away from the front door. She was just walking across the parking lot.

Because Williams did not see the victim enter the store, nor did he see which door she used, his testimony would not have discredited Marcel's testimony that McCoy confessed that he and another perpetrator "'rushed' the manager of the store as she opened the back door." McCoy, 853 So. 2d at 399.

Additionally, we conclude that McCoy cannot demonstrate prejudice. Williams' testimony would not have contradicted that of Marcel and, therefore, no reasonable probability exists that, but for trial counsel's failure to present Williams, the outcome of McCoy's trial would have been different. Our confidence in the outcome has not been undermined. See Bradley, 33 So. 3d at 672 (noting that the prejudice prong of Strickland is satisfied only where a reasonable probability exists that, but for counsel's deficient performance, the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052)).

In light of the foregoing, we hold that McCoy is not entitled to relief under his first claim of ineffectiveness.

McCoy, 113 So. 3d at 711-12.

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough

review of the record, this Court concludes that the state court's adjudication was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Therefore, Ground One(ii) is due to be denied.

### iii.   Failure to Object to Religious Reference

According to Petitioner, his trial counsel was ineffective for failing to object to the potential jurors being informed that Petitioner had changed his name to Jamil Rashid prior to the crime and to the state's comment during jury selection that the jurors should use their "God-given common sense." Doc. 1 at 38. Petitioner contends this was an improper reference to his Muslim faith. Id. He further argues that a prospective juror then commented on the fact that Petitioner was of "Muslim descent" and "that for the people of the Muslim faith 'death is not that big of a deal.'" Id. at 39. Petitioner argues that counsel should have moved to strike the entire panel. Id.

Petitioner raised this claim in his Rule 3.851 motion. The state court held an evidentiary hearing, after which it denied Petitioner's claim. Ex. 42 at 17-18.

Petitioner appealed, and the Florida Supreme Court per curiam affirmed the state court's decision in a written opinion. As to this issue, the court found as follows:

In his second claim, McCoy asserts that trial counsel was ineffective for the failure to object to religious references during voir dire and the penalty phase. While we hold that this claim of ineffectiveness fails, we address two specific challenges by McCoy in detail.

*"God Given Common Sense"*—During voir dire, the prosecutor asked the prospective jurors with regard to arriving at a verdict, "Will all of you promise to apply your God given common sense in that deliberation?" Trial counsel did not object to the phrasing of the question. The postconviction court denied this ineffectiveness subclaim on two bases. First, it noted that McCoy failed to rely upon any legal authority prohibiting the use of the phrase "God given common sense." Second, the postconviction court found that the phrase was not objectionable and, in fact, noted "in the Jacksonville community, any objection by defense counsel to the State's mention of 'God given common sense,' could have adversely affected the panel's view of the defense."

To prevail on an ineffective assistance of counsel claim for failure to object to statements by the prosecution, a defendant "must first show that the comments were improper or objectionable and that there was no tactical reason for failing to object." Stephens v. State, 975 So. 2d 405, 420 (Fla. 2007). Here, the postconviction court expressly found that this phrase was not objectionable. McCoy fails to reference a single case which holds that the use of the phrase "God given common sense" by a prosecutor constitutes reversible error, or that a trial attorney's failure to object to the use of this phrase constitutes deficient performance.

Further, we conclude that trial counsel's failure to object to the prosecutor's single, fleeting reference to "God given common sense" did not prejudice the outcome of McCoy's trial. To the contrary, had trial

counsel objected to this phrase, that objection likely would have harmed McCoy's defense. According to the postconviction court, an objection to a reference to common sense in this fashion would have caused the jury to view the defense negatively. At the time the order denying postconviction relief was signed, the author had served as a judge in Duval County for approximately twenty-two years. It is not unreasonable to conclude that a judge with such extensive service in one community would have a fairly accurate perspective on how its members would react to certain actions by attorneys during a trial. Even McCoy acknowledged in his brief that the Jacksonville community is "very religious." Thus, although trial counsel did not object to this phrase, the failure to do so actually operated to protect McCoy from a negative perception by the jury and, possibly, prejudice against his defense.

Based on the foregoing, this subclaim of ineffectiveness fails.

*Comments by Prospective Juror about Islam—* McCoy also contends that trial counsel was ineffective for failure to move to strike the entire venire after one prospective juror made negative comments about Islam. During voir dire, the following dialogue occurred:

> TRIAL COUNSEL: [Y]ou said yesterday that you were against the death penalty.

> PROSPECTIVE JUROR: Yes, sir.

> TRIAL COUNSEL: And I am not going to try to change your mind or anything. I just want to see how strong your feelings are. Can you think of a situation where you could vote for a death sentence for someone convicted of first degree murder?

25

PROSPECTIVE JUROR: No, sir, not necessarily. Coming into this Court[,] I abide by the laws of this state and this count[r]y[,] so the point is to find the truth, but in my heart and searching my soul I am still going to vote for a life sentence due to the fact if, you know, the defendant is guilty or even if he is not[,] the point is[,] *from what I gathered so far by the change of his name[,][[fn]] he is of a Moslem descent . . . and what I know of the Moslems is that death isn't that big of a deal. The penalty of death, to be killed[,] is not that big of a deal.*

Me as a Christian faith I have learned that him living a life, giving of himself to someone else to better their life is more of a punishment and a learning system for him than to take his life.

[fn] During voir dire, the trial court advised the venire that McCoy had changed his legal name:

You have heard me refer to the defendant in this case by two names . . . Jamil Rashid formally [sic] known as Richard Lee McCoy. The indictment refers to the defendant by these two names.

Several years ago the defendant changed his legal name from Richard Lee McCoy to Jamil Rashid. [To s]ome people he is still known by his birth name, Richard Lee McCoy, and to some he is known by his new legal name, Jamil Rashid. Both names are

26

> included in the indictment so that
> there will be no confusion.

(Emphasis supplied.) This was the only reference
during voir dire to the Muslim faith. Trial counsel did
not move to strike the entire jury panel in response to
the comment; however, the prospective juror did not
serve because of his statement that he could not
impose a sentence of death for any reason.

We have explained that "[a] venire member's
expression of an opinion before the entire panel is not
normally considered sufficient to taint the remainder
of the panel." Johnson v. State, 903 So. 2d 888, 897
(Fla. 2005) (citing Brower v. State, 727 So. 2d 1026,
1027 (Fla. 4th DCA 1999)). McCoy has failed to
establish that the prospective juror's statements
tainted the entire jury, such that trial counsel should
have moved to strike the entire venire. First, we note
that after the prospective juror made the comment,
not a single juror referenced or inquired into McCoy's
religion, i.e., whether he was a member of the Islamic
faith. Second, as noted by the postconviction court in
its order, McCoy's trial occurred prior to the
September 11, 2001, terrorist attacks. Even after
those attacks, two federal courts have held that the
simple reference to a defendant either as a Muslim or
by his Muslim name was insufficient to taint a jury or
compromise a trial. See, e.g., United States v. Malik,
241 Fed. Appx. 873, 875-76 (3d Cir. 2007) (holding
that the government's referral to defendant as "the
Muslim guy" thirteen times before counsel objected
did not require a mistrial); Mack v. Cain, 2008 WL
1901715, at *9 (W.D. La. 2008) (challenge to
prosecutor's referral to defendant by his Muslim
name "necessarily implies that 9/11 had so prejudiced
the jurors that they were biased against all Muslims
regardless of their race, national origin, allegiance, or
non-involvement in the attacks. By the time of the
May 2002 trial [in Mack], some eight months had

passed since 9/11, and [this court] simply cannot ascribe such irrational prejudice to the jurors.").

The prospective juror's assertions about McCoy's name change and tenets of the Muslim faith constituted unsubstantiated opinions—not details presented and asserted as true by the prosecutor. As noted by the Fourth District Court of Appeal in <u>Brower</u>, "[p]rospective jurors are frequently exposed, before and during voir dire, to innumerable comments, attitudes, and points of view, the subscription to which would be improper for an unbiased juror." 727 So. 2d at 1027. Were excusal of an entire panel required for every allegedly biased or improper comment by a prospective juror, selecting a jury in a case—especially a capital case—would be exceedingly difficult. Thus, we agree with the postconviction court's determination that trial counsel was not deficient for failing to request that the entire venire be struck, and this subclaim of ineffectiveness fails.

<u>McCoy</u>, 113 So. 3d at 712-14.

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, this Court concludes that the state court's adjudication was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Therefore, Ground One(iii) is due to be denied.

iv.   Failure to Exclude Fingerprint Evidence

Petitioner argues that his trial counsel was ineffective for "failing to challenge the testimony of Mr. Kocik," the state's fingerprint expert. Doc. 1 at 44. He argues that he was prejudiced by counsel's failure to object to "Kocik's testimony that deviated from the lack of ACE-V methodology." Doc. 32 at 20. Specifically, he argues that "[i]t would have been inappropriate for Mr. Kocik . . . to conclusively opine the fingerprints recovered on the ABC liquors bag at the crime scene . . . matched those of Mr. McCoy without having followed the ACE-V method of comparison." Doc. 1 at 44.

In Petitioner's postconviction proceeding, he argued that counsel was ineffective by failing to use a defense fingerprint expert. The state court held an evidentiary hearing, after which it denied Petitioner's claim:

> In claim twenty-two,[] the Defendant alleges that counsel rendered ineffective assistance for failing to utilize a defense fingerprint expert. The Defendant claims that an expert could have emphasized to the jury that the Defendant's fingerprints were only found on the outside of the money bag, suggesting that the Defendant did not place his hands inside the bag during the robbery. The Defendant argues that defense counsel should have utilized an expert to bolster this defense strategy.
>
> During trial, the State presented the testimony of Richard Kocik, a Jacksonville Sheriffs Office latent print examiner. Mr. Kocik examined the ABC Liquors store money bag for the existence of latent fingerprints. Mr. Kocik found three latent prints of

29

value and identified them as belonging to the Defendant. During cross-examination, Mr. Kocik stated that latent fingerprints can remain on objects for years. Mr. Kocik conceded that he could not determine how long the Defendant's fingerprints had been on the bag or where the bag was when the fingerprints were deposited on it. Mr. Kocik acknowledged that while he found eight points of comparison between the prints on the bag and the Defendant's fingerprints, the FBI has never identified a minimum number of points that are necessary to make a comparison.

During the evidentiary hearing, defense counsel stated that he had retained two latent print experts to examine the fingerprints. Defense counsel testified that he did not call either of the two latent print experts because their testimony would not have been helpful to the defense. One of the experts opined that the Defendant's fingerprints were on the bag and defense counsel thought that the other expert identified the prints as belonging to the Defendant, but could not be sure without checking his notes. Defense counsel explained that the two experts' testimony would have been hurtful because during cross-examination they would have identified the fingerprints as belonging to the Defendant. Defense counsel opined that getting Mr. Kocik's concession, that he did not know how long the Defendant's fingerprints had been on the bag, was about the best that he could do. Defense counsel stated that the Defendant's testimony that his fingerprints could have been on the bag somewhat undermined his cross examination of Mr. Kocik. Defense counsel explained that the only thing more that he could have done would have been to get an expert and instead of having the prints analyzed, have the expert testify that a partial print is not as good as a whole print and that fingerprints can stay on objects for a long period of time. Defense counsel could not remember why he did not pursue this testimony, but he did not think

that this testimony would have added very much to Mr. Kocik's concession.

Thus, the testimony during the evidentiary hearing established that defense counsel did seek out additional latent print experts. Defense counsel made a reasonable strategic decision to not call either expert as it would have hurt the defense. This strategic decision does not amount to ineffective assistance. <u>See</u> <u>Rose v. State</u>, 985 So. 2d 500, 506 (Fla. 2008) (citing <u>Occhicone v. State</u>, 768 So. 2d 1037 , 1048 (Fla. 2000)); <u>Gorby v. State</u>, 819 So. 2d 664 , 678 (Fla. 2002). This Court does not find defense counsel ineffective for failing to pursue another expert and call the expert to testify. Further, collateral counsel did not present the testimony of a fingerprint expert during the evidentiary hearing to support the proposition that the Defendant did not place his hand inside the money bag during the robbery. Having failed to show error on the part of counsel or prejudice to his case, the Defendant's ground twenty-two is denied.

Ex. 42 at 39-41 (footnote and internal record citations omitted).

On appeal to the Florida Supreme Court, Petitioner failed to raise this claim. As Petitioner failed to complete one full round of the State's established appellate review process, this Court finds the claim to be unexhausted and procedurally barred.

Petitioner requests this Court consider this claim under the narrow exception outlined in <u>Martinez</u>. In <u>Martinez</u>, the Supreme Court recognized a narrow exception to the rule that an attorney's error in a postconviction proceeding does not constitute cause for a procedural default:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

Id. at 17. To establish cause under Martinez, Petitioner must demonstrate that the defaulted ineffective assistance of trial counsel claim "is a substantial one, which is to say that [he] must demonstrate that the claim has some merit." Id. at 14; see also Lambrix v. Sec'y Fla. Dep't of Corr., 851 F.3d 1158, 1164 (11th Cir. 2017). A claim is not substantial if it lacks merit or is wholly without factual support. See Martinez, 566 U.S. at 15-16.

Here, upon review of the record, the Court finds that the underlying ineffective assistance of trial counsel claim is not substantial. To the extent Petitioner raises the same claim here as he did in his Rule 3.851 proceeding, this Court agrees with the postconviction court's reasoning in denying the claim. Additionally, Petitioner acknowledged during his trial testimony that his fingerprints were on the bag because, according to him, he found the empty bag in a parking lot and returned it. Ex. 8 at 1026-28. Therefore, considering the record, the Court finds that trial counsel was not ineffective in the manner Petitioner suggests, and thus, this claim is not substantial. Martinez does not apply to excuse the procedural default. Petitioner has failed to otherwise show cause to excuse the procedural default or resulting prejudice. Nor has Petitioner

shown that a fundamental miscarriage of justice would result if the Court did not address the claim on the merits. Thus, Ground One(iv) is due to be denied.

v.   <u>Conceding a Robbery Occurred</u>

Petitioner argues that his trial counsel was ineffective for conceding that a robbery occurred. Doc. 1 at 45-46. Petitioner complains that trial counsel, during voir dire, stated that a murder and robbery occurred and the issue in the trial would be whether Petitioner did it. <u>Id.</u> at 45. Petitioner asserts that during a deposition, William Howell, an investigator for ABC Liquors, stated that Debrenda Dorsey and another female employee were suspects in a theft of the ABC Liquors store, but the investigation was dropped. <u>Id.</u> at 45-46.[5] According to Petitioner, Howell also stated that the week before the murder, there was a shortage in one of the cash drawers and the victim had a confrontation with Dorsey. <u>Id.</u> at 46 n.13. Thus, Petitioner argues his trial counsel should not have conceded a robbery occurred.

---

[5] In denying a different ground in Petitioner's Rule 3.851 motion, the post-conviction court noted: "Although the Defendant claims that evidence of employee theft existed, the Defendant failed to present any support for this assertion during the evidentiary hearing. Further, defense counsel did explore employee theft during the cross-examination of Nino Ramirez, the director of safety and security for ABC Fine Wine and Liquors. However, given the overwhelming evidence against the Defendant, including the fact that his fingerprints were found on the ABC money pouch, it would have been hard for defense counsel to imply that an employee was responsible for the robbery and murder." Ex. 42 at 21 (internal record citations omitted).

33

Petitioner raised this claim in his Rule 3.851 motion. The state court held an evidentiary hearing, after which it denied Petitioner's claim. Ex. 42 at 18-19.

Petitioner appealed, and the Florida Supreme Court per curiam affirmed the state court's decision in a written opinion. As to this issue, the court found as follows:

> In his third claim, McCoy contends that trial counsel was ineffective for conceding during voir dire that a robbery of the ABC Liquors store had occurred. Trial counsel stated to the venire: "[T]here is no question . . . that there was a robbery and that there was a murder. The issue in this trial will be is [McCoy] the one who did it, have they arrested the right guy or the wrong guy."
>
> When asked during the evidentiary hearing why he conceded that a robbery had occurred, trial counsel offered a detailed explanation:
>
>> [There] was a tape, number one, of someone in the store who didn't appear to be an employee leading someone who appeared to be the employee around the store. There was testimony that there was money missing from the store. . . . It looked like a crime on the tape. A robbery, of course, requires something to be taken, and I guess the key was testimony that money was missing.
>>
>> . . . .
>>
>> [Y]ou have to make decisions to make the defense that you have the most persuasive that you can, and I think you

lose points with the jury on the main issue if you contest those issues which you don't have a good argument on. In looking back on the case, I think that to argue it wasn't a robbery is a weak argument. To argue that it wasn't Mr. McCoy who did this is a somewhat stronger argument. It's all we had. And you just—you want to keep your argument—your main argument as strong as you can and not lose credibility with the jury.

In denying this claim, the postconvic[ti]on court concluded that trial counsel's actions constituted a reasonable tactical decision. We agree.

In Belcher v. State, 961 So. 2d 239, 249 (Fla. 2007), trial counsel made the following comments during opening statements:

Obviously, and quite tragically, Ms. Embry is dead. There's no dispute about that. . . . [A] lot of the evidence that you'll be hearing will be important for your consideration. But the evidence, that kind of evidence, will not show you what the ultimate question is. It won't answer the ultimate question for you, which is who did it. And that's what you need to be concerned with.

In holding that trial counsel was not ineffective for conceding that the victim was deceased, this Court noted that during the evidentiary hearing, trial counsel explained "his strategy in the opening statement was to build credibility with the jury by not disputing the fact that the victim was dead." Id. We concluded that trial counsel's actions constituted a strategic decision which "provides no basis for an ineffectiveness claim." Id.

In the instant case, a video of the crime was played for jurors. It reflects someone leading the victim—the store manager—through the store. While in the store office, someone appears to bend down in the area of one of the store safes. Someone also walks over to a bag in which the ABC Liquors store pouches are delivered. After exiting the office, the victim and the intruder proceed to the cash registers and then enter the storeroom, where the victim is later found dead. The intruder exits the storeroom alone. The regional manager for ABC Liquors testified during trial that $415 was missing from the store's two safes.

Given that trial counsel's theory of the defense was that McCoy had an alibi for the time of the murder, we conclude that it was a strategic decision to concede that a robbery had occurred. See generally Occhicone, 768 So. 2d at 1048 ("strategic decisions do not constitute ineffective assistance of counsel"). In light of the previously discussed evidence presented at trial, it would have been a weak argument to assert that no robbery of the ABC Liquors store occurred. For trial counsel to present such an argument likely would have caused the defense to lose credibility with the jury. Because counsel will not be deemed deficient for making a strategic decision to maintain credibility with a jury, this claim of ineffectiveness fails. See Hutchinson v. State, 17 So. 3d 696, 702 (Fla. 2009).

McCoy, 113 So. 3d at 714-16.

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, this Court concludes that the state court's adjudication was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based

on an unreasonable determination of the facts in light of the evidence presented. Therefore, Ground One(v) is due to be denied.

> vi.    Failure to Warn Petitioner re: Testifying

Petitioner argues that trial counsel was ineffective for failing to warn him about the dangers of testifying on his own behalf. Doc. 1 at 46. He argues that "[t]he trial court would not allow Mr. McCoy's counsel to question Marcel about the Lee's Chicken robbery unless Mr. McCoy took the stand to lay a proper predicate." Id. He continues, "Trial counsel Chipperfield made the decision that Mr. McCoy would testify in order to lay a proper predicate. . . . Remarkably, after Mr. McCoy testified, Marcel was not recalled." Id. at 46-48.[6]

Petitioner raised this claim in his Rule 3.851 motion. The state court held an evidentiary hearing, after which it denied Petitioner's claim. Ex. 42 at 29-31.

Petitioner appealed, and the Florida Supreme Court per curiam affirmed the state court's decision in a written opinion. As to this issue, the court found as follows:

> McCoy next contends that trial counsel was ineffective for failing to warn him about the dangers of testifying on his own behalf. During trial, counsel attempted to cross-examine Zsa Zsa Marcel about her purported involvement in the robbery of Lee's Chicken restaurant. He also sought to have two

---

[6] The Court addresses Petitioner's claim regarding trial counsel's alleged ineffectiveness for failing to recall Marcel in Ground One(vii).

witnesses to the restaurant robbery identify Marcel as the perpetrator. Trial counsel's reason for seeking to question Marcel and these two other witnesses was to demonstrate "that [Marcel] had a motive to rat on [McCoy] before he rat[t]ed on her and to make up a story that he had committed this robbery at the ABC Liquors, so it goes to her motive and bias, her interest in making him a non-credible witness by becoming a witness against him in the ABC case."

The trial court refused to allow counsel to question Marcel about the Lee's Chicken restaurant robbery on cross-examination as a State witness, but stated that trial counsel could present her as a defense witness if McCoy were to first testify about her confession to him that she robbed the restaurant. The trial court's explanation for this ruling was as follows:

> My concern is what if we go through all of this great exercise and we put [Marcel] on trial for the armed robbery and we have all the people testify and all that kind of stuff and your client decides he doesn't want to testify what have we done at that point?
>
> . . . .
>
> We have created a mistrial because we have introduced gobs of totally irrelevant and very damaging evidence for the state that is totally irrelevant because there is at that point no evidence that she told him about [the restaurant robbery].
>
> . . . .
>
> So I have a suspicion that if you are entitled to put this on at all you would

38

only be entitled to put it on in your case and only then after you have had [McCoy] testify that [Marcel] confessed this to him which then makes it become relevant.

. . . I am not inclined to let all—let this secondary trial go on unless and until it becomes record evidence that [McCoy] knew about it and that [Marcel] knew anything about it.

McCoy testified, but before he did so, the trial court conducted the following colloquy:

COURT: Mr. McCoy, do you understand, sir, that in this trial you have the absolute right to testify and you have an equally absolute right not to testify?

MCCOY: Yes, sir.

COURT: And do you understand that the decision with regard to whether or not you testify must be yours and yours alone?

MCCOY: Yes, sir.

COURT: Are you satisfied, sir, that the defense that I have just been told about that you wish to testify is your decision and yours alone?

MCCOY: Yes, sir, it is.

COURT: Would I be correct then in assuming that no one has forced you to testify and no one is compelling you in this case to testify?

MCCOY: No, sir. No one is compelling me to testify, sir.

COURT: Okay. *And you have been advised of the consequences of testifying such as being cross examined about prior felony convictions and the like, is that right?*

MCCOY: *Yes, sir, I have.*

COURT: And are you satisfied taking all those things in balance that it's in your best interest to testify in the case?

MCCOY: For the truth to come out, yes, sir.

COURT: All right. Thank you.

(Emphasis supplied.) McCoy testified that Marcel confessed to him she had robbed Lee's Chicken restaurant. McCoy admitted that it was his voice on the recorded conversation that was played for the jurors, but testified that he lied to Marcel about being involved in the ABC Liquors robbery in an attempt to "impress" her because he saw that "this is the kind of lifestyle she was . . . into."

With regard to the ABC Liquors pouch that was discovered in the store office after the murder, the following dialogue occurred during cross-examination as to why McCoy's fingerprints were on that pouch:

PROSECUTOR: You said you have been to that ABC two times?

MCCOY: Yes, sir.

PROSECUTOR: They ever let you into the office to touch one of these [pouches]?

MCCOY: I ran across one of those [in] April of 2000.

PROSECUTOR: You ran across one?

MCCOY: Yes, sir, I did.

PROSECUTOR: Where was that?

MCCOY: The ABC Liquors on Roosevelt. I was coming from the Days Inn hotel next to the dog track on Orange Park on the 8th of April. I had a flat tire. I pulled over and changed my tire.

. . . .

It was in the parking lot. Nothing was in it and it was unzipped and I did touch it and I mailed it in.

McCoy testified that on April 7, 2000 (more than one month before the robbery/murder), he spent the night with a woman named Gwendolyn Brown at the Days Inn in room 112. He left the next morning without Ms. Brown, and thereafter discovered the pouch in the parking lot of a different ABC Liquors store than the one where the robbery/murder occurred. The State subsequently presented the guest services manager for the Days Inn referenced by McCoy in his testimony. The manager testified that on April 7, 2000, room 112 was reserved by a woman named Betty White.

During the evidentiary hearing, trial counsel explained his rationale for having McCoy testify: "[I]f

you're raising an alibi, which is what we were doing, it helps to have the defendant explain where he was at the time of the crime. If they have your fingerprints on the bank bag, it can help to try and give an explanation for why the fingerprints are there." Nonetheless, trial counsel explained that he always leaves the decision whether to testify up to the client.

The decision as to whether McCoy would testify had not been established or determined prior to trial. With regard to that issue, the following discussion occurred during the evidentiary hearing:

> STATE: All right. You were asked some questions . . . regarding the defendant's decision to testify. And you said this was a difficult case. Did you mean for the defense when you said that?

> TRIAL COUNSEL: Yeah.

> . . . .

> STATE: Did you, as best you could, in your professional judgment and experience, discuss that decision with Mr. McCoy prior to his colloquy with Judge Dearing about testifying?

> TRIAL COUNSEL: I don't have a specific memory of it as I sit here and I didn't see notes about it in the notes that I reviewed, but *that has always been my practice.*

> . . . .

> And I specifically remember at some point, whether it was during trial or before trial, telling Mr. McCoy that

42

explanation of the fingerprint was going to be very hard.

> STATE: And, in fact, *would it not be your practice to discuss the defendant's right to testify with him on multiple occasions prior to a capital case?*

> TRIAL COUNSEL: *Oh, yeah.*

(Emphasis supplied.)

Trial counsel acknowledged that McCoy's admission that the fingerprints on the pouch were his undermined the defense's efforts to discredit the State fingerprint expert. With regard to McCoy's testimony that he found the ABC Liquors pouch in a parking lot, the evidentiary transcript reflects:

> POSTCONVICTION COUNSEL: When you told [McCoy] we need to have an explanation for your fingerprints found on the receipt bag—

> . . . .

> —prior to trial or during trial, did he offer you an explanation, prior to testifying, if you can recall.

> TRIAL COUNSEL: I can't recall. . . . *I know for sure that some of the details that came out in his testimony were new to me*, but I can't remember how many of them are.

> POSTCONVICTION COUNSEL: Well, let me ask you about the details he testified to in his trial testimony to the effect that he found the bag in a parking

lot and mailed it back to ABC. Do you recall that?

TRIAL COUNSEL: I recall that trial testimony. I'd have to look at my notes to see if it was told to me in that way at anytime in the past.

POSTCONVICTION COUNSEL: Did you ever discuss whether you thought that was a good explanation or not? Not suggesting that you can change his testimony, but when he told you that, whether or not that might be something—if that's what your explanation is, maybe we just won't present it.

TRIAL COUNSEL: . . . Normally when I talk to a client I take notes and I jot down things about what we talk about. *I've not seen that in these notes that I reviewed.*

(Emphasis supplied.)

McCoy testified during the evidentiary hearing that he did inform trial counsel as to why his fingerprints were on the ABC Liquors pouch, but trial counsel never discussed this explanation with McCoy before he testified. In denying this claim, the postconviction court concluded that the testimony of trial counsel was more credible than that of McCoy, and that counsel did advise McCoy of the consequences of testifying.

This issue amounts to a matter of witness credibility. Trial counsel testified that as a matter of course he discusses with a defendant the decision to testify on multiple occasions. Conversely, McCoy contended that no such discussion occurred during his

capital case. We have explained that "[a]s long as the trial court's findings are supported by competent substantial evidence, 'this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.'" Blanco v. State, 702 So. 2d 1250, 1252 (Fla. 1997) (quoting Demps v. State, 462 So. 2d 1074, 1075 (Fla. 1984)); see also Cox v. State, 966 So. 2d 337, 357-58 (Fla. 2007) (noting that the trial court is frequently in a superior position to evaluate the testimony based upon its observation of the bearing, demeanor, and credibility of witnesses).

Here, the postconviction court concluded that trial counsel was the more credible witness and accepted his testimony. This decision is supported by the fact that the trial court conducted a colloquy with McCoy to determine whether the decision to testify was his own. During that colloquy, McCoy himself admitted that he had been advised of the consequences of testifying, and he concluded that testifying was in his best interest. Further, during the evidentiary hearing, McCoy acknowledged that the trial court cautioned him that if he testified, he would be subject to cross-examination. Based upon these acknowledgements by McCoy during both trial and the evidentiary hearing, we conclude that the postconviction court's finding of credibility is supported by competent, substantial evidence. This finding refutes the assertion that trial counsel failed to advise McCoy of the consequences of testifying, and therefore, we reject this claim of ineffectiveness.

McCoy, 113 So. 3d at 716-19 (footnote omitted).

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, this Court concludes that the state court's adjudication

was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Therefore, Ground One(vi) is due to be denied.

       vii.   <u>Failure to Recall Zsa Zsa Marcel and Eyewitnesses to Restaurant Robbery</u>

According to Petitioner, his trial counsel was ineffective for failing to recall Marcel to impeach her regarding her involvement with the Lee's Chicken robbery. Doc. 1 at 48-49. Counsel was also ineffective for failing to call the eyewitnesses to the Lee's Chicken robbery. <u>Id.</u> at 49.

Petitioner raised this claim in his Rule 3.851 motion. The state court held an evidentiary hearing, after which it denied Petitioner's claim.

Petitioner appealed, and the Florida Supreme Court per curiam affirmed the state court's decision in a written opinion. As to this issue, the court found as follows:

> The background for this challenge is complex and rather unique. The postconviction court's order provides a comprehensive summary:
>
> > Prior to trial, defense counsel had reason to believe that Ms. Marcel was involved in the Lee's Chicken robbery. Defense counsel filed a motion to compel investigation of Ms. Marcel and argued that the State's refusal to investigate her was a deliberate attempt to prevent the defense from impeaching her with

pending charges. Defense counsel requested that this Court either dismiss the charges against the Defendant or prohibit Ms. Marcel from testifying during the trial.

The detective investigating the Lee's Chicken robbery conducted a photo lineup, which included Ms. Marcel's photo, but the victims were unable to identify her as the perpetrator. Defense counsel sent his investigator to interview an employee from Lee's Chicken, who stated that the perpetrator was a woman with a scar on her neck. Defense counsel's investigator showed a photograph of Ms. Marcel to two other victims of the Lee's Chicken robbery and they thought that she could have been the perpetrator, however, they wanted to see her in person and look at her neck before they would positively identify her.

Defense counsel requested that Ms. Marcel be presented to the victims of the Lee's Chicken robbery. Defense counsel argued that Ms. Marcel had motive to lie because if the Defendant was convicted in this case, he would not be a credible witness against her in any prosecution for the Lee's Chicken robbery. Defense counsel further argued that the State's refusal to investigate the Lee's Chicken robbery was distorting the fact finding process. The State asserted that there was not enough evidence to charge Ms. Marcel. This Court denied defense counsel's motion, finding that there was no prosecutorial misconduct and that the State's actions were reasonable.

47

At trial, during Ms. Marcel's cross-examination, defense counsel attempted to ask her if she told the police about the Defendant's involvement in the ABC Liquors robbery and murder because she was afraid that he would turn her in for a crime. The State objected. At sidebar, defense counsel argued that he was going to try to show Ms. Marcel's bias and to try and prove that she had a motive for turning the Defendant in.

Defense counsel then proffered questions to Ms. Marcel. During the proffer, Ms. Marcel testified that she did not implicate the Defendant out of fear that he would turn her in for a crime she committed. Ms. Marcel testified that she did not confess her involvement in the Lee's Chicken restaurant robbery to the Defendant. Ms. Marcel further testified that her purpose in wearing a turtleneck to court was not to cover the scar on her neck.

Defense counsel proffered the rest of his argument outside the presence of Ms. Marcel. Defense counsel had two victims of the Lee's Chicken restaurant robbery in the hall outside of the courtroom to attempt to identify Ms. Marcel. Defense counsel instructed the victims to pay careful attention to every African American female who walked by. One of the witnesses wanted to see Ms. Marcel's neck. The other witness stated that Ms. Marcel had the same build, mannerisms, and features as the perpetrator, but noted that she was wearing a turtleneck and that he wanted to see if she had the birth mark on her

neck. Defense counsel was concerned that another Lee's Chicken restaurant employee . . . had alerted Ms. Marcel to defense counsel's attempt to have her identified in the courthouse and, therefore, Ms. Marcel attempted to disguise herself. Defense counsel requested that this Court allow him to ask Ms. Marcel to show her neck to the jury and the audience. This Court noted that if Ms. Marcel was put on secondary trial regarding the Lee's Chicken robbery, and the Defendant chose not to testify regarding her confession, then a mistrial would result, as irrelevant and damaging evidence would have been introduced. This Court stated that once the Defendant testified regarding the confession, then defense counsel could continue this cross-examination of Ms. Marcel.

_____

(Citations to record omitted.)

Although Marcel was not presented as a defense witness, during closing statements trial counsel addressed her potential bias in testifying against McCoy:

Well, then there is another reason you may want to distrust what Zsa Zsa Marcel says. Mr. McCoy testified that Zsa Zsa confessed to him that she had robbed Lee's Chicken on June the 10th just three days before this homicide, so she perhaps had another reason that she would want Mr. McCoy out of the picture because she would tell a lie about him before he could turn her in for something he knew that

49

she had done, and . . . you know from the testimony she has got a scar on her neck. For some reason when she came in here and testified she wore a turtle neck and she wore a wig. . . .

*Failure to Present Marcel as a Defense Witness*—Trial counsel offered the following explanation as to why he did not present Marcel as a defense witness:

[W]e were trying to discredit [Marcel], but—and I don't remember what my thinking was at the time, but right now my thinking would be why call her back, she's just going to deny it, she's going to say no, and what I already had in the record was obvious evasion by her by wearing a wig and wearing a turtleneck and I had Mr. McCoy saying that she admitted [her involvement in the robbery] to him so I've got things in the record that are not controverted. If I call her back and [she says] no, that's crazy, I didn't do that, then I've got something that is controverted rather than something that is unrebutted.

The postconviction court denied this ineffectiveness subclaim on the basis that trial counsel made a tactical decision not to present Marcel as a defense witness.

This Court has previously held that "the strategic decision of trial counsel not to present a certain witness does not constitute ineffective assistance of counsel if that decision was the product of a reasonable trial strategy." <u>Taylor v. State</u>, 87 So. 3d 749, 763 (Fla. 2012). During trial, counsel questioned Marcel out of the presence of the jury, and it became clear that Marcel would not concede her

participation in the robbery or that she confessed same to McCoy:

> TRIAL COUNSEL: Ms. Marcel, isn't [it] true that you told the police this story about Mr. McCoy partly because you were afraid that he would turn you in for a crime that you committed?

> MARCEL: No.

> TRIAL COUNSEL: Isn't it true that a few days before June the 13th of 2000 you confessed to Mr. McCoy that you had robbed the Lee's Chicken on San Juan Avenue and you had shot a man?

> MARCEL: No, I didn't.

> TRIAL COUNSEL: Isn't it true you were afraid that he would turn you in so you told the police that he did this crime at the ABC?

> MARCEL: No.

This proffer reveals that, even if trial counsel had presented Marcel as a witness, she would have only contradicted McCoy's testimony. Counsel's decision not to present Marcel so that McCoy's testimony with regard to her involvement in the Lee's Chicken robbery remained unrebutted constitutes a matter of trial strategy. Because "strategic decisions do not constitute ineffective assistance of counsel," this subclaim fails. Occhicone, 768 So. 2d at 1048; see also Taylor, 87 So. 3d at 763.

*Failure to Present the Witnesses of the Lee's Chicken Robbery*—When asked by postconviction counsel why he waited until mid-trial to attempt to have the Lee's Chicken witnesses identify Marcel,

trial counsel testified that McCoy first notified him of Marcel's alleged participation in the robbery in August 2000, approximately nine months before the trial. Trial counsel was unable to recall how long after McCoy's revelation it was before he was able to pinpoint the robbery and then locate the witnesses. However, counsel knew that he worked on this issue prior to trial because, otherwise, the witnesses to the robbery would not have appeared at the courthouse. On cross-examination, trial counsel conceded that Marcel's purported involvement in the Lee's Chicken robbery would not have changed the fact that McCoy's fingerprints had been located on an ABC Liquors pouch discovered at the crime scene. The postconviction court denied this claim, concluding that trial counsel "made diligent attempts to procure the identification of Ms. Marcel and have the victims of the robbery testify."

Neither of the witnesses to the Lee's Chicken robbery who appeared at the courthouse during McCoy's trial testified during the evidentiary hearing. As such, there has never been a definitive identification of Zsa Zsa Marcel as the person who robbed the restaurant and shot the manager. Counsel even admitted during trial that if the witnesses could not identify Marcel as the perpetrator, he had no reason to present them as part of McCoy's defense. Thus, there is no definitive evidence that, had these witnesses testified, they would have corroborated McCoy's testimony that Marcel robbed the Lee's Chicken restaurant and demonstrated her bias in testifying for the State. On this basis alone, we hold that McCoy has failed to demonstrate he was prejudiced by trial counsel's performance.

Further, the postconviction court's description of the facts surrounding this issue demonstrate that trial counsel diligently and repeatedly attempted to have the Lee's Chicken robbery witnesses identify Marcel as the perpetrator. During the State's case,

McCoy's counsel asked the trial court if it would allow him to ask Marcel

> to show her neck to the jury and to the audience and allow the two witnesses that we have out in the hall into the courtroom so they can look at her neck. I know that's unusual but, Your Honor, I have got no way to prove that she did this robbery unless the two eye witnesses [sic] to the robbery can look at her, and there is no other way they are going to be able to look at her. . . .

The trial court denied the request, stating that only if McCoy first testified as to what Marcel allegedly told him about the Lee's Chicken robbery would this evidence possibly be admissible.

During the defense's case, the trial court refused counsel's request to compel the witnesses to "view Ms. Marcel from a distance close enough that they can see the scar on her neck." The trial court stated, "I do not consider that I have the jurisdiction to compel subpoenaed witnesses to go outside of the courtroom and conduct any investigation of their own." The trial court did afford counsel time to have the victims look at Marcel if they were willing to do so. That viewing did not occur because, as stated by trial counsel:

> [T]he witnesses were advised by . . . the Justice Coalition not to walk down and look at Ms. Marcel, and I asked them—I told them I couldn't compel them. I told them what the Court said and I think they have left now. They don't want to do it.

Given these diligent—albeit unsuccessful— efforts to have the witnesses to the Lee's Chicken

robbery identify Marcel, we conclude that the performance of trial counsel was not deficient. In further support of our conclusion is the fact that postconviction counsel failed to present any evidence to indicate that trial counsel was remiss or untimely in locating the witnesses.

In light of the foregoing, we affirm the decision below and reject McCoy's claims of ineffectiveness under this issue.

McCoy, 113 So. 3d at 719-23 (footnotes omitted).

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, this Court concludes that the state court's adjudication was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Therefore, Ground One(vii) is due to be denied.

> viii.   Failure to Use Deposition and Sworn Statement to Impeach Zsa Zsa Marcel

Petitioner contends that his trial counsel was ineffective for failing to impeach Marcel with her deposition testimony. Doc. 1 at 49-50. Specifically, Petitioner contends that Marcel made inconsistent statements regarding the transcript of their recorded conversation in which Petitioner allegedly admitted his guilt. Id.

Petitioner raised this claim in his Rule 3.851 motion. The state court held

an evidentiary hearing, after which it denied Petitioner's claim:

> In sub-claim (a), the Defendant claims that counsel rendered ineffective assistance for failing to use deposition testimony to cast doubt on Zsa Zsa Marcel's testimony and the transcript she helped to create. Specifically, the Defendant claims that Ms. Marcel's statement during trial that she listened to the audiotape of the conversation between herself and the Defendant, and then helped create a transcript, should have been impeached using prior deposition testimony. The Defendant asserts that in Ms. Marcel's deposition, she admitted to hearing only a portion of the audiotape before meeting with the State and preparing the transcript.
>
> During her deposition, Ms. Marcel testified that she listened to the audiotape several times. Ms. Marcel explained that the most recent time she listened to the tape, she did not hear the whole tape. Ms. Marcel stated that the transcript of the audiotape was accurate. During the trial, Ms. Marcel testified that she listened to the tape and that it was a fair and accurate depiction of her conversation with the Defendant. During the evidentiary hearing, defense counsel, Alan Chipperfield, testified that he was not sure how he would have impeached Ms. Marcel on this issue.
>
> Thus, when read in context, Ms. Marcel's deposition testimony indicated that she only heard a portion of the audiotape the most recent time she listened to it, rather than the Defendant's assertion that she only heard a portion of the audiotape prior to preparing the transcript. As such, defense counsel could not have impeached Ms. Marcel using this deposition testimony. Further, even if defense counsel had attempted to impeach Ms. Marcel with this testimony, the State could have then questioned Ms.

> Marcel regarding the other times she listened to the audiotape. Therefore, the Defendant has failed to show error on the part of counsel or prejudice to his case.

Ex. 42 at 9-10 (internal record citations omitted).

On appeal to the Florida Supreme Court, Petitioner failed to raise this claim. As Petitioner failed to complete one full round of the State's established appellate review process, this Court finds the claim to be unexhausted and procedurally barred. Petitioner argues that the limited exception in <u>Martinez</u> allows the Court to consider this claim. Upon review, however, the Court finds the underlying ineffective assistance of trial counsel claim is not substantial for the reasons stated by the postconviction court. Thus, <u>Martinez</u> does not apply to Petitioner's claim. Petitioner has failed to otherwise show cause to excuse the procedural default or resulting prejudice. Nor has Petitioner shown that a fundamental miscarriage of justice would result if the Court did not address the claim on the merits. As such, this claim is due to be denied.

ix.     <u>Failure to Develop and Present Other Perpetrator Evidence</u>

Petitioner contends that the police report contained information from witnesses suggesting that others were in the parking lot around the time of the murder, but trial counsel failed to present this evidence at trial. Doc. 1 at 51-52.

Petitioner raised this claim in his Rule 3.851 motion. The state court held

an evidentiary hearing, after which it denied Petitioner's claim:

> In claim four, the Defendant claims that defense counsel rendered ineffective assistance for failing to present "other perpetrator" evidence. Specifically, the Defendant argues that evidence of another perpetrator who drove a red car should have been presented to the jury. First, the Defendant points to a Charles Girwin, who had been fired from the ABC Liquors store and who drove a red and gray Ford Bronco. Second, the Defendant points to a David Peterson, whose burgundy Chevrolet Lumina was seen near the store on the morning of the murder.

> During the evidentiary hearing, the Defendant testified that Mr. Girwin had been fired by the victim. Neither Mr. Girwin, nor Mr. Peterson, were called to testify during the evidentiary hearing.

> However, during the evidentiary hearing, defense counsel, Alan Chipperfield testified that he would have and did attempt to investigate other people who could have been suspects in this case. Further, this Court finds that the alleged facts in claim four are not of such significance that they would have changed the outcome of the case. As discussed in claim II, subclaim (b), *supra,* there is ample evidence connecting the Defendant to the crime. Significantly, it was the Defendant's fingerprints found on the money pouch, rather than Mr. Girwin's or Mr. Peterson's. Additionally, it was the Defendant who admitted his involvement in the robbery and murder to Zsa Zsa Marcel. As such, the Defendant cannot show prejudice to his case and claim four is denied. <u>Strickland</u>, 466 U.S. 668.

Ex. 42 at 14-15.

On appeal to the Florida Supreme Court, Petitioner failed to raise this claim. As Petitioner failed to complete one full round of the State's established appellate review process, this Court finds the claim to be unexhausted and procedurally barred. Petitioner asks this Court to consider this claim under the narrow exception outlined in <u>Martinez</u>. Upon review of the record, this Court finds that the underlying ineffective assistance of trial counsel claim is not substantial for the reasons stated by the postconviction court. Thus, <u>Martinez</u> does not apply to Petitioner's claim. Petitioner has failed to otherwise show cause to excuse the procedural default or resulting prejudice. Nor has Petitioner shown that a fundamental miscarriage of justice would result if the Court did not address the claim on the merits. Thus, Ground One(ix) is due to be denied.

       x.      <u>Failure to Present Jury with Chronology of Key Events During Closing Argument</u>

Petitioner contends that his trial counsel was ineffective for failing to provide the jury with a chronology of key events and present the testimony of key witnesses. Doc. 1 at 52. Petitioner lists out the "key events" and further argues that counsel had an investigator (Tony Thomas) that he failed to call at trial. <u>Id.</u> at 52-53.

Petitioner raised this claim in his Rule 3.851 motion. The state court held an evidentiary hearing, after which it denied Petitioner's claim:

        In claim twelve, the Defendant argues that defense counsel rendered ineffective assistance for

58

failing to present the jury with a chronology of key events during closing argument. The Defendant testified that he left the house of his girlfriend, Dorothy Small, at 8:12 or 8:13 a.m. on the morning of the murder. At 8:16 a.m., the victim, Shervie Elliot, entered the ABC Liquors store and deactivated the alarm. The State investigator, Mark Bachara, testified that he drove the distance from Ms. Small's home to the ABC Liquors store and that the trip took him six minutes. The Defendant argues that "assuming investigator March [sic] Bachara was telling the truth, the earliest that the Defendant could have arrived at the crime scene was 8:18 or 8:19 a.m."[fn] Therefore, the Defendant argues that this refutes the State's comment during opening statement that, when Ms. Elliot arrived at the store, she was forced into the store at gunpoint and ordered to turn off the alarm system.

> [fn] The Defendant fails to point out that the argument that defense counsel should have presented this chronology of events to the jury also rests upon the assumption that the Defendant's testimony was both truthful and accurate.

During the trial, defense witness Sherry Cross testified that between 8:00 and 8:30 a.m., on the morning of the murder, she saw the Defendant at Ms. Small's house, taking out the trash. During the evidentiary hearing, defense counsel, Alan Chipperfield, testified that he did not know why he did not use a visual aid or provide a chronology of events during closing argument. Mr. Chipperfield stated that it "probably would have been a good idea." Mr. Chipperfield testified that one of the Public Defender's investigators, Tony Thomas, drove from Ms. Small's home to the ABC Liquors store taking different routes and that each trip took him either nine or ten minutes. Mr. Chipperfield noted that, in

Jacksonville, a trip can take different amounts of time depending upon the day of the week, the time of day, and whether school is in session. Mr. Chipperfield testified that he did not put on evidence of the route timing because he was not sure that he had an accurate starting time he could have used to measure this, other than the Defendant's testimony.

The Defendant's claim fails. Although defense counsel did not specifically present a visual aid or chronology of events during closing argument, he did make a similar argument. Relying on Ms. Small's testimony, defense counsel pointed out that if she saw the Defendant between 8:00 and 8:05 a.m., it might be physically possible for him to have made it to the ABC Liquors store by 8:16 a.m. Defense counsel stated that the distance was five miles, that if you speed, and that if you do not hit the traffic lights, you might be lucky enough to make it the store by 8:16 a.m. However, defense counsel then explained that it was not likely that the Defendant made it to the store in that time frame.

Assuming *arguendo* that defense counsel should have taken his closing argument a step further and presented a visual aid or chronology of events, the Defendant still cannot show prejudice to his case. As explained in claim II, sub-claim (b), *supra,* there was ample evidence connecting the Defendant to the armed robbery and murder. It is not likely that relying on the Defendant's testimony that he left at 8:12 or 8:13 a.m. and presenting a visual aid or chronology of events would have negated the rest of the evidence connecting the Defendant to the crime. The jury obviously did not believe the Defendant's testimony. Therefore, claim twelve is denied.

Ex. 42 at 31-33 (internal record citations omitted).

On appeal to the Florida Supreme Court, Petitioner failed to raise this claim. As Petitioner failed to complete one full round of the State's established appellate review process, this Court finds the claim to be unexhausted and procedurally barred. Petitioner asks this Court to apply the limited exception outlined in <u>Martinez</u> to excuse his procedural default of this claim. Upon review of the record, however, the Court finds that the underlying ineffective assistance of trial counsel claim is not substantial. This Court agrees with the postconviction court's reasoning in denying this claim. Therefore, trial counsel was not ineffective in the manner Petitioner suggests, and regardless, Petitioner fails to show prejudice. Because Petitioner has failed to show cause to excuse the procedural default or resulting prejudice, and he has not shown that a fundamental miscarriage of justice would result if the Court did not address the claim on the merits, Ground One(x) is due to be denied.

xi.   <u>Failure to Obtain and Use Store Surveillance Videos and Still Photos Taken of Petitioner Prior to the Robbery</u>

Petitioner asserts that his trial counsel was ineffective by failing to present to the jury the still photographs taken of him in the store the night before the robbery so they could compare those photos with the photos of "the actual killer [who] was taller and thinner than" Petitioner. Doc. 1 at 54.

Petitioner raised this claim in his Rule 3.851 motion. The state court held an evidentiary hearing, after which it denied the claim:

In claim fifteen, the Defendant claims that defense counsel rendered ineffective assistance for failing to obtain and use store surveillance videos and still photos taken of the Defendant during the month prior to the murder, and for failing to make and use enlargements. During the trial, Debrenda Dorsey testified that she recognized the Defendant as a customer who had been in the ABC Liquors store prior to the murder. The Defendant contends that a public defender's investigator reviewed an ABC surveillance videotape from the day before the murder which showed the Defendant purchasing soda. The Defendant argues that the videotape from the day before the murder could have been used for comparison to show that the murderer was someone other than the Defendant, someone who was taller and thinner. The Defendant also argues that defense counsel could have used still photographs from the store to show that there was no theft from the cash drawers, which he argues would have undermined the State's felony murder theory.

Just before the end of closing argument, defense counsel did utilize the surveillance video of the murder to argue that the Defendant was not the perpetrator. Defense counsel suggested to the jury that they could get an idea of how large the perpetrator was by comparing him to the victim. Defense counsel stated that the victim was heavy and that the perpetrator was bigger, thicker, and heavier than the victim. Defense counsel suggested that if the perpetrator was bigger than the victim, then the perpetrator was not the Defendant.

During the evidentiary hearing, defense counsel, Alan Chipperfield, testified that there was a video from the day before the murder that may have possibly shown the Defendant purchasing a twelve pack of beer. Mr. Chipperfield stated that there was some question of whether that was even the Defendant, partly because the Defendant did not

drink beer. Mr. Chipperfield attempted to use the video to compare the height of the perpetrator to fixed objects in the store and did not get anything that was of help. Mr. Chipperfield also stated that he compared the video of the time that Brenda Dorsey testified she saw the Defendant in the store to the time lapse video of the robbery and murder. Mr. Chipperfield could not make a match or a non-match between the two videos. Mr. Chipperfield testified that the time lapse photography was fuzzy.

There is no ineffective assistance. First, defense counsel did utilize the time lapse video of the robbery and murder to illustrate the differences in size between the perpetrator and the victim. Further, defense counsel could not have utilized the video to undermine the State's felony murder theory, as the video would not have negated the testimony that money was missing from the store's safe. Additionally, defense counsel testified that he could not make a match or a non-match between the video from the day before the murder and the video of the robbery and murder. Therefore, this Court finds that defense counsel made a reasonable strategic decision to not use the video from the day before the murder. Tactical decisions do not constitute ineffective assistance of counsel. See Rose v. State, 985 So. 2d 500, 506 (Fla. 2008) (citing Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000)); Gorby v. State, 819 So. 2d 664, 678 (Fla. 2002).

With regard to the argument that defense counsel should have used enlargements, collateral counsel did not introduce any such enlargements at the evidentiary hearing, therefore, this Court cannot determine the impact they would have had on the jury. However, enlargements likely would not have negated the overwhelming evidence against the Defendant and most importantly would not have negated the fingerprint evidence implicating the Defendant. Therefore, having shown no error on the

> part of counsel or prejudice to his case, the
> Defendant's claim fifteen is denied.

Ex. 42 at 34-36 (internal record citations omitted).

On appeal to the Florida Supreme Court, Petitioner failed to raise this claim. As Petitioner failed to complete one full round of the State's established appellate review process, this Court finds the claim to be unexhausted and procedurally barred. Petitioner asks this Court to consider this claim under the narrow exception outlined in <u>Martinez</u>. For the reasons stated by the postconviction court, however, the underlying ineffective assistance of trial counsel claim is not substantial. Thus, <u>Martinez</u> does not apply. Petitioner has failed to otherwise show cause to excuse the procedural default or resulting prejudice. Nor has Petitioner shown that a fundamental miscarriage of justice would result if the Court did not address the claim on the merits. Thus, Ground One(xi) is due to be denied.

xii.   <u>Failure to Point Out Inconsistencies Between Petitioner's Version of Incident and Actual Facts</u>

Petitioner contends that trial counsel rendered ineffective assistance by failing to point out the inconsistences in Marcel's testimony regarding what Petitioner allegedly told her and the actual facts. Doc. 1 at 55; <u>see also</u> <u>id.</u> at 39-40. He states that "Marcel testified when Mr. McCoy bragged to her about committing the crime in question, he said 'he had an accomplice, he wore gloves, seven shots were fired, and he got $4,000.'" <u>Id.</u> at 55. The evidence, however,

"included three partial fingerprints of Mr. McCoy on a plastic receipt pouch, three shell casings, three bullet trajectory paths through the victim's body, and a determination that only $415 cash had been stolen." Id.

Petitioner raised this claim in his Rule 3.851 motion. The state court held an evidentiary hearing, after which it denied Petitioner's claim:

> In claim sixteen, the Defendant claims that defense counsel rendered ineffective assistance for failing to point out, during closing argument, the inconsistencies between the Defendant's version of the robbery and murder that he told to Zsa Zsa Marcel versus the actual facts surrounding the robbery and murder. At trial, Ms. Marcel testified that the Defendant told her that he and an accomplice robbed the ABC Liquors store, that he was wearing gloves, that $4,000 dollars was taken, and that while he was taking the money out of the safe, he heard seven gunshots. However, the evidence introduced at trial indicated that the Defendant's fingerprints were found on a money bag in the store, that only $415 was taken, and that only three bullets were fired.

> During the trial, defense counsel questioned Ms. Marcel regarding the Defendant's version of the story, including his statements that he had a partner, that he took $4,000, that he wore gloves, and that he heard seven gunshots. During the Defendant's testimony, he stated that everything he said on the tape was a lie and that he made up the story about the robbery to impress Ms. Marcel. During closing argument, defense counsel pointed out that the audiotape of the conversation between the Defendant and Ms. Marcel was just an example of two people trying to deceive each other. During the evidentiary hearing, defense counsel testified that he did not remember why he did not bring out the inconsistences during closing argument.

65

> Thus, the record reflects that the information regarding the inconsistencies was before the jury, but it was not specifically detailed by defense counsel during closing argument. Assuming *arguendo* that defense counsel should have pointed out the inconsistences to the jury during closing argument, the Defendant can still not show prejudice. Had defense counsel done as the Defendant suggests, it would not have changed the jury's verdict given the overwhelming evidence connecting the Defendant to the crime, and would not have negated the fact that the Defendant's fingerprints were found on the money bag in an "employee only" area of the store. Therefore, having failed to show prejudice to his case, the Defendant's sixteenth claim is denied.

Ex. 42 at 36-38 (internal record citations omitted).

On appeal to the Florida Supreme Court, Petitioner failed to raise this claim. As Petitioner failed to complete one full round of the State's established appellate review process, this Court finds the claim to be unexhausted and procedurally barred. Petitioner asks this Court to consider this claim under the narrow exception outlined in <u>Martinez</u>. For the reasons stated by the postconviction court, however, the underlying ineffective assistance of trial counsel claim is not substantial. The jury was presented with the inconsistencies during Marcel's trial testimony. Even assuming deficient performance, Petitioner cannot show prejudice based on the totality of the evidence presented during his trial. Because this claim is not substantial, <u>Martinez</u> does not apply. Petitioner has failed to otherwise show cause to excuse

the procedural default or resulting prejudice. Nor has Petitioner shown that a fundamental miscarriage of justice would result if the Court did not address the claim on the merits. Thus, Ground One(xii) is due to be denied.

**b. Ground Two**

Petitioner asserts that the trial court erred by restricting the defense's cross-examination of the State's chief witness, Zsa Zsa Marcel. Doc. 1 at 57.

Petitioner raised this claim on direct appeal. The Florida Supreme Court denied it:

> The appellant asserts that the trial court improperly limited his cross-examination of Marcel regarding her putative involvement in a restaurant robbery, as well as her behavior with regard to the telephone account of McCoy's father. First, our examination of the record reveals that the trial court never prohibited the defense from cross-examining Marcel on the subject of her putative Lee's Chicken robbery. In fact, the trial court only disallowed cross-examination on the subject during Marcel's testimony for the State, and then only because no evidentiary predicate on the matter had yet been established by the defense. At that time, the trial court explicitly advised the defense as follows:
>
> > I understand what you are doing. My concern is what if we go through all of this great exercise and we put her [Marcel] on trial for the armed robbery and we have all the people testify and all that kind of stuff and your client decides he doesn't want to testify what have we done at that point?
>
> . . . .

67

We have created a mistrial because we have introduced gobs of totally irrelevant and very damaging evidence for the state that is totally irrelevant because there is at that point no evidence that she told him about it [the restaurant robbery].

. . . .

So I have this suspicion that if you are entitled to put this on at all you would only be entitled to put it on in your case and only then after you have had him [McCoy] testify that she [Marcel] confessed this to him which then makes it become relevant.

I have no problem with making her come back for you to continue your cross examination of her after it is a matter of record that it is relevant, but I am not inclined to let all—let this secondary trial go on unless and until it becomes record evidence that he [McCoy] knew about it and that she [Marcel] knew anything about it.

The defense did not pursue the matter further during its case-in-chief, other than submitting the testimony of McCoy relating that Marcel had confessed to him her involvement in an armed robbery of Lee's Chicken. Clearly, the trial court did not limit cross-examination of Marcel as to this issue; therefore, no relief is warranted.

The trial court did prohibit testimony and cross-examination regarding the assertion that Marcel had charged hundreds of dollars of telephone calls to the telephone account registered to McCoy's father,

granting the State's pretrial motion in limine to limit such evidence. Our standard of review with regard to trial court rulings on the proper scope of cross-examination is clear: "Limitation of cross-examination is subject to an abuse of discretion standard." Moore v. State, 701 So. 2d 545, 549 (Fla. 1997); see also Winner v. Sharp, 43 So. 2d 634, 635 (Fla. 1949) ("The admission or rejection of impeaching testimony is within the sound discretion of the trial court."); Lewis v. State, 754 So. 2d 897, 901 (Fla. 1st DCA 2000). Thus, unless the trial court abused its discretion, which is guided and informed by applicable precedent, this Court will not disturb the judgment below.

The appellant's contentions regarding the trial court's prohibition against cross-examination of Marcel with respect to her supposed telephone account abuses are wholly without merit. While it is true that "[a] defendant should be afforded wide latitude in demonstrating bias or possible motive on the part of a witness," Henry v. State, 688 So 2d 963, 966 (Fla. 1st DCA 1997), any questioning on the subject of this uncommonly extraneous issue would have been improper. Indeed, when analyzing a similar claim of improper restriction of cross-examination, this Court succinctly stated, "[E]vidence of particular acts of ethical misconduct cannot be introduced to impeach the credibility of a witness. The only proper inquiry into a witness's character for impeachment purposes goes to the witness's reputation for truth and veracity." Fernandez v. State, 730 So. 2d 277, 282 (Fla. 1999); see also Baker v. State, 804 So. 2d 564, 567 (Fla. 1st DCA 2002) (holding that "other than evidence of prior convictions . . . credibility may not be attacked by proof that the witness has committed specific acts of misconduct"). Certainly, the trial court did not abuse its broad discretion when it made the following conclusions:

> I am going to find that the evidence
> that has been explained to me is not
> admissible impeachment evidence under
> 90.608 through 610 because it does not
> demonstrate bias towards the defendant.
> It may show an effort to stick his father
> with some phone costs if in fact it shows
> that at all. But that—I cannot make a
> leap of faith from that to show some
> animosity or bias or prejudice towards
> the defendant.
>
> We agree with the trial court. Evidence of
> Marcel's misuse of the appellant's father's telephone
> account was entirely irrelevant to the issues before
> the jury. The trial court's decision was entirely
> proper.

McCoy v. State, 853 So. 2d 396, 406-07 (Fla. 2003).

In his brief on direct appeal, Petitioner failed to present the federal nature

of this claim. Indeed, in making his argument, Petitioner twice stated that the

trial court's limiting of Marcel's cross-examination violated "his constitutional

right to confront and cross-examine the witnesses against him," but he failed to

cite or identify any federal constitutional provisions or law. Ex. 23 at 48, 53. He

did cite, without discussion, one federal case in his reply brief. Ex. 25 at 16

(citing Truman v. Wainwright, 514 F.2d 150 (5th Cir. 1975). This one citation

in a reply brief is not sufficient to exhaust the federal nature of the claim. As

such, it appears this claim is unexhausted and procedurally barred. See Lucas

v. Sec'y, Dep't of Corr., 682 F.3d 1342, 1352 (11th Cir. 2012) ("[A] petitioner does

not 'fairly present' a claim to the state court 'if that court must read beyond a

petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so.'" (quoting <u>Baldwin v. Reese</u>, 541 U.S. 27, 32 (2004))); <u>see also</u> <u>Raulerson v. Warden</u>, 928 F.3d 987, 1005 (11th Cir. 2019) ("In the context of exhaustion, 'it is not at all clear that a petitioner can exhaust a federal claim by raising an analogous state claim,' even if the federal and state rights are identical in content." (quoting <u>Preston v. Sec'y, Fla. Dep't of Corr.</u>, 785 F.3d at 449, 460 (11th Cir. 2015))).

Nevertheless, to the extent Petitioner raises a federal constitutional claim properly before this Court, the Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, this Court concludes that the state court's adjudication was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Therefore, Ground Two is due to be denied.

### c. Ground Three

Petitioner claims that his appellate counsel was ineffective for failing to ensure that the surveillance videos were included in the record on appeal. Doc. 1 at 62. He argues that "[g]iven the dispute as to whether it was actually Mr. McCoy on the videotape, it was imperative that the reviewing court have access

to such critical evidence." Id. In his Memorandum, Petitioner argues that his collateral counsel failed to file a state habeas petition" despite Petitioner's requests that counsel do so. Doc. 2 at 35-36. He asserts that he "tried to bring the issue to the attention of the Florida Supreme Court himself and he proceeded to file a pro se state habeas petition." Id. at 36-37; see also Doc 1 at 64. Attached to his Memorandum is a pro se petition for writ of habeas corpus with a prison date stamp of February 28, 2013 (Doc. 2-6). In that petition, he argued, among other issues, that his "registry counsel" was ineffective for not filing a petition alleging ineffective assistance of appellate counsel for failing to ensure the surveillance videotape was included in the record on appeal. See id. at 5-6. A review of the Florida Supreme Court's docket, however, does not show any cases filed by Petitioner in 2013. It does, however, show that a pro se habeas corpus petition was filed on March 6, 2013, in Petitioner's then-pending appeal from the denial of his Rule 3.851 motion. See McCoy v. State, No. SC2010-2206 (Fla.). The Florida Supreme Court's decision in that case did not mention the pro se petition, and this Court cannot independently verify whether it was the same petition as is attached to Petitioner's Memorandum. Regardless, it appears this petition was never considered.

Petitioner also filed pro se habeas petitions in 2014 and 2016. See McCoy v. Crews, 160 So. 3d 896 (Fla. 2014) (SC14-1601); McCoy v. State, No. SC16-477, 2016 WL 1222427, at *1 (Fla. Mar. 29, 2016). The documents filed in those

cases are not part of the record filed here. But, the Florida Supreme Court's decisions reflect that the respondent filed a motion to strike in the 2014 case and a motion to dismiss in the 2016 case, both of which were granted. See McCoy, 160 So. 3d at 896 ("Respondent's Motion to Strike Pro Se Belated Habeas Petition is hereby granted and the case is hereby dismissed."); McCoy, 2016 WL 1222427, at *1 ("Respondent's Motion to Dismiss is granted. The pro se petition for writ of habeas corpus is hereby dismissed.").

Here, Respondents argue that any ineffective assistance of appellate counsel claims are procedurally barred as Petitioner never raised any such claims in state court. Doc. 20 at 156-57, 164-74. Respondents further contend that Petitioner's assertions are vague and conclusory, id. at 160-64,[7] as well as meritless, id. at 174-88.

As noted above, the Florida Supreme Court's docket does not reflect that Petitioner properly initiated a case in that court by filing a petition alleging ineffective assistance of appellate counsel. And his 2014 and 2016 petitions

---

[7] According to Respondents, "[i]t is not clear from the petition or supporting memorandum of law what issues McCoy believes should have been raised by appellate counsel in the direct appeal to the Florida Supreme Court." Doc. 20 at 156. Contrary to Respondents' argument, Petitioner is very clear in his Petition: "Appellate counsel failed to insure that the surveillance videotapes were included in the record on appeal." Doc. 1 at 62.

were dismissed without comment.[8] Thus, it appears that Petitioner failed to give the state courts an opportunity to resolve this claim before raising it here. He argues that the narrow exception outlined in <u>Martinez</u> should be extended to collateral counsel's ineffective assistance. Doc. 2 at 35-36. The Supreme Court, however, has refused to extend <u>Martinez</u> to such claims. <u>See</u> <u>Davila v. Davis</u>, 582 U.S. 521, 529 (2017) (declining "to extend <u>Martinez</u> to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when a prisoner's state postconviction counsel provides ineffective assistance by failing to raise that claim"). Thus, <u>Martinez</u> does not apply.

Petitioner also argues that "he fairly presented this issue to the state court and that it is properly before this Court on its merits" because he "specifically told his counsel that he wanted a state habeas petition filed," and he filed a pro se petition with the Florida Supreme Court. Doc. 2 at 36 (citing <u>Clemmons v. Delo</u>, 124 F.3d 944 (8th Cir. 1997)). Considering the circumstances, for purposes of this Order, the Court will assume the claim is properly exhausted.

---

[8] According to Respondents, the 2014 and 2016 pro se habeas petitions were unauthorized because Petitioner was represented by counsel as well as untimely. Doc. 20 at 164-71.

To that end, upon review of the record, the Court finds that appellate counsel was not ineffective for failing to raise on direct appeal a claim that trial counsel was ineffective for not ensuring the surveillance videos were part of the record on appeal. In its opinion affirming Petitioner's convictions and sentences, the Florida Supreme Court specifically noted that "[t]he store's surveillance tape showed the robbery and murder occurring from 8:20 a.m. to 8:33 a.m. on June 13" and "revealed that an African-American male had committed the robbery and murder." McCoy, 853 So. 2d at 399. The court also described what the tape showed:

> Legally sufficient evidence exists in the record on appeal to support the trial court's application of the CCP aggravator. As noted by the trial court, the video surveillance tape, when considered in conjunction with the medical examiner's testimony, demonstrates advance procurement of the murder weapon, absolutely no resistance or provocation on the part of the victim, and a killing carried out as a matter of course. McCoy methodically guided the victim throughout the ABC Liquors store, attempting to turn off the alarm and surveillance taping devices, and obtaining all of the cash within the establishment. He then forced Elliott into a storage room—a place which held no money or valuables for him to obtain. There, he shot the victim once in the abdomen to disable her, once in the upper neck or lower head to paralyze her, and once in the face, killing her. The final two shots were fired from between six and twelve inches away.

Id. at 407. The Florida Supreme Court clearly considered the surveillance videotapes, and there is nothing to suggest that the videotapes were not

75

included with the record on appeal. Thus, because trial counsel was not ineffective in the manner Petitioner suggests, appellate counsel cannot be deemed ineffective for failing to raise a meritless claim. Ground Three is due to be denied.

In light of the foregoing, it is

**ORDERED**:

1.      The Petition (Doc. 1) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2.      If Petitioner appeals, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[9]

---

[9] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.

3.     The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 25th day of September, 2023.



TIMOTHY J. CORRIGAN
United States District Judge

Attachments:
Zsa Zsa Marcel Deposition
Zsa Zsa Marcel Sworn Statement
c:
Richard McCoy, #099752
Counsel of Record